Maurice PARADIS

v.

**HERITAGE LOAN AND INVESTMENT CO.**

**In re Claim of Antonio CALIRI.**

No. 95–207–Appeal.

Supreme Court of Rhode Island.

June 18, 1996.

Normand G. Benoit, Providence, for Plaintiff.

Joseph Avanzato and William Mark Russo, Providence, for Defendant.

## OPINION

BOURCIER, Justice.

This case comes before us on the permanent receiver's appeal from a final judgment of the Superior Court affirming a Superior Court master's decision finding that Antonio Caliri (Caliri) had identifiable deposits totaling $179,116.67 with Heritage Loan and Investment Co. (Heritage) and was entitled to payment thereof from Edward D. Pare, Jr., the permanent receiver of Heritage (receiver).

█ On March 7, 1983, Caliri deposited $50,000 in Heritage and was given as evidence of that deposit a bank machine-printed passbook numbered 02–005991–5 noting the receipt by Heritage of Caliri's deposit. That account was one of several that Caliri maintained at Heritage, and the only one challenged by the receiver. The receiver's challenge was premised upon the manner and the nature of the passbook entries. All except the initial deposit were handwritten entries

showing additional deposits by Caliri of $3,000 on June 18, 1985, $30,000 on February 2, 1989, $5,000 on March 16, 1989, $35,042.81 on April 5, 1989, and $39,515.43 on April 23, 1990. The passbook also contained handwritten entries indicating accruing interest on the account as well as occasional withdrawals by Caliri. The account itself, and the transactions reflected by the handwritten entries in the passbook, were not recorded on the bank computers or in the official bank records. As such, the receiver considered the account an "off-line" account [1] and rejected Caliri's request for withdrawal and payment.

Although Heritage possessed no specific record of the off-line account, there was, however, other bank record inferential evidence that supported the validity and existence of Caliri's off-line account. A tape from a Heritage adding-machine showed a $50,000 initial deposit made on March 7, 1983, into an account at Heritage that showed after that deposit a balance of $50,000. Thus, an inference could be drawn that Caliri's $50,000 deposit constituted his initial deposit into a newly opened account for which he received passbook number 02–005991–5. Additionally, a Heritage withdrawal slip record indicates that a deposit was again made on March 16, 1989, into Caliri's off-line account that coincided with a withdrawal made from an on-line account that Caliri had maintained at Heritage. That on-line account withdrawal slip discloses that the entire total of the on-line account, $35,042.81, was transferred into Caliri's off-line account, and the on-line account was then marked "closed." The bank records also reflect that a check in the amount of $39,304, which had been drawn on Greater Providence Deposit Corporation by Caliri on April 23, 1990, had passed through Heritage on the same day and was in turn deposited at Heritage the following day, April 24, 1990, in Heritage's general account at Fleet Bank in Providence. The inference could certainly be drawn that Caliri's handwritten passbook en-

---

1. An off-line account is an account that is not recorded on the computers or in the books of a bank. The challenged account is an off-line account, as explained later in this opinion. An "on-line" account, conversely, is an account that *is* recorded on the computers or in the books of a bank. Presumably, if Caliri's account had been an on-line account, like Caliri's other accounts at Heritage, the receiver would not have challenged Caliri's right to payment.

try showing a $39,515.43 deposit on April 23, 1990, was in fact traceable to the Greater Providence Deposit Corporation check. It is noteworthy to observe that on each of the deposit dates indicated in the passbook, there was a reduction in Heritage's "plug number," a money figure used by Heritage to balance at the end of each bank day its bank books, that essentially balanced the deposit amounts listed in the Caliri passbook. All of the above evidence corroborated the handwritten deposit entries contained in the passbook.

On November 18, 1990, Heritage went into receivership at or about the same time many other financial institutions in Rhode Island were likewise placed into receivership. The Governor and the Department of Business Regulation on January 1, 1991, ordered the closing of numerous state banks and credit unions. The General Assembly immediately enacted comprehensive legislation establishing the Depositors Economic Protection Corporation (DEPCO) for the administration of the assets of the financial institutions forced into receivership. In the receivership proceedings a Superior Court master was assigned to adjudicate all the off-line deposit accounts at Heritage. See G.L.1956 Chapter 116 of title 42. The order was entered on February 12, 1992.[2] See also G.L.1956 title 19 (financial institutions legislation). Caliri, in accordance with that order, sought to obtain from the Heritage receivership his account moneys. His claim was denied. Caliri then appealed to the Superior Court, and the case was assigned for hearing before a mas-

ter in accordance with the February 12, 1992 order of the Superior Court.

At the hearing before the master involving Caliri's off-line account, the master, after hearing testimony from Caliri, Joseph Mollicone (Mollicone), and a forensic financial analyst, found that Caliri did in fact make deposits in Heritage that on April 23, 1990, stood at a total of $179,116.67, and he was, as a result, entitled to payment of that sum from the receiver. The receiver duly filed his appeal from that decision to the Superior Court, pursuant to Superior Court Administrative Order No. 94–12, and the Superior Court trial justice affirmed the master's decision.

The receiver here challenges the finding made by both the Master and the trial justice that Caliri's deposits at Heritage amounted to deposits that Caliri was entitled both to withdraw and to receive payment of from the receiver.

The receiver contends here that because no official record of the account existed on the computer records at Heritage, as there was with Caliri's other, on-line, accounts at Heritage, Caliri should have been put on notice that his challenged off-line account was not being handled or managed according to Heritage's usual banking business practices. The receiver argues, further, that because the off-line account was not maintained according to the usual banking business practices of Heritage, it did not qualify as a "deposit" for the purposes of § 42–116–12,

2. The order provided that the master

"is appointed * * * for the purpose of hearing and determining the claims filed with the receiver relating to off-line deposit accounts, which claims shall be deemed to include claims to funds evidenced by handwritten or typewritten savings passbooks, claims to funds alleged to have been withdrawn without the depositor's authority to do so, claims to funds evidenced by safekeeping receipts, and claims to any funds which are not verifiable on the computer records maintained by Heritage Loan and Investment Company * * *.

"That Master McAtee shall have all the powers of a Justice of the Superior Court with respect to the hearings and determination of off-line deposit account claims, including, without limitation, those powers enumerated in Rhode

Island General Laws 8–2–11.1 (1985 Reenactment)."

General Laws 1956 § 8–2–11.1 as enacted by P.L.1991, ch. 44, art. 73, § 1 provides, in pertinent part:

"(c) Such administrator/master may be authorized:

(1) To regulate all proceedings before him or her;

(2) To do all acts and take all measures necessary or proper for the efficient performance of his or her duties;

(3) To require the production before him or her of books, papers, vouchers, documents and writings;

(4) To rule upon the admissibility of evidence;

(5) To issue subpoenas for the appearance of witnesses, to put witnesses on oath, to examine them and to call parties to the proceeding and examine them upon oath."

and the receiver is not obligated to pay to Caliri any of the money allegedly placed in his off-line account.

■ Section 42–116–12 obligates the receiver to pay all deposit liabilities of eligible institutions, including Heritage's deposit liabilities. Section 42–116–3(h) defines "deposit liabilities" as "liabilities of an eligible institution in respect of time, savings, demand or other deposits of the institution, including without limitation certificates of deposit, individual retirement accounts, escrow and fiduciary accounts, and unpaid cashiers checks issued to depositors or issued to or for depositors in the course of a withdrawal from an account at the institution." There is nothing in those provisions of the General Laws that establishes any specific requirements that must first be met before a placement of money in a bank is considered to be a deposit liability requiring payment by the receiver, pursuant to § 42–116–12.

■ The receiver urges this court to adopt the definition of "deposit" used in the priority statute, G.L.1956 § 19–12–7(a)(3), as amended by P.L.1995, ch. 82, § 50, which incorporates the definition of deposit used by the Federal Deposit Insurance Corporation (FDIC). That federal definition places restrictions on what is considered a deposit. It requires, among other criteria, that before the FDIC is required to make any payment to a claimant, the claimant must first establish that the deposit was maintained in the usual course of the bank's business, which the receiver argues was not demonstrated in this case. *See* 12 U.S.C. § 1813(1). The priority statute and the federal definition of "deposit" it incorporates is, it is to be noted, relevant only *after* a determination is made by the receiver that a claimant does in fact have an allowable claim. Once it is determined that there is an allowable claim, the priority of that claim can then be established, pursuant to § 19–12–7. The only issue before us on this appeal is the preliminary determination of Caliri's right to payment and not the priority of his claim. Thus, § 19–12–7(a)(3) is not relevant to our discussion and opinion.

■ The receiver additionally contends that § 42–116–12(d), which contains the rules for aggregating deposit liabilities, incorporates FDIC law. As with the priority statute, the aggregation statute is not relevant to the master's decision in this case or to this Court's determination of whether Caliri has an allowable claim entitled to payment. Before deposit liabilities can be aggregated pursuant to the terms of § 42–116–12(d), there must first be a finding made that there is a valid deposit liability. Again, it is that preliminary finding of a valid deposit liability that is before this Court on this appeal and not the aggregation of Caliri's deposits.

■ The existence of those provisions incorporating the federal FDIC law into the Rhode Island statutory scheme does not, as the receiver asserts, support the incorporation of the federal definition of "deposit" into § 42–116–12. Our General Assembly was clearly aware of the FDIC law and its definition since it significantly and specifically integrated it into the priority and the aggregation segments of its statutes. Thus it appears to us that the legislative intent, evident from the statutes in question, was to incorporate FDIC law into the DEPCO legislation only when it specifically did so, as it did in the priority and aggregation subject-matter statutes. The General Assembly did not incorporate 12 U.S.C. § 1813(1) into § 42–116–12. Instead, it defined "deposit liabilities" in § 42–116–3(h) without any reference to the federal law and without any restrictions or limitations on its definition of "deposit." Absent a specific reference in § 42–116–12 to the federal definition of "deposit," this court cannot judicially incorporate that federal definition into the statute. Our role is to interpret legislation and not to rewrite legislation. *DeAngelis v. Rhode Island Ethics Commission*, 656 A.2d 967, 970 (R.I.1995).

Since the Legislature provided an unrestricted definition of "deposit liabilities," the statutory words must be read according to their plain and ordinary meaning. "In construing a statute, this court has the responsibility of effectuating the intent of the Legislature by examining the statute in its entirety and giving words their plain and

ordinary meaning. * * * [W]hen a statute has a plain, clear, and unambiguous meaning, no interpretation is required." *Whitehouse v. Rumford Property and Liability Insurance Co.,* 658 A.2d 506, 508 (R.I.1995). *See also Little v. Conflict of Interest Commission,* 121 R.I. 232, 397 A.2d 884 (1979).

The term "deposit" signifies "the act of placing money in the '*custody*' of a bank, to be withdrawn at the will of the depositor." (Emphasis added.) 5A *Michie on Banks and Banking,* ch. 9, § 3 at 34 (1994 Replacement Vol.).

■ It is clear from the master's hearing record that Caliri *placed* money in the custody of Heritage. Courtney Regan, a financial analyst from the Price Waterhouse accounting firm, retained by the receiver to review the Heritage bank records, testified that each deposit indicated by handwritten entries in Caliri's passbook coincided with essentially equal deductions in Heritage's plug number, a number used by the bank at the end of each banking day to balance its receipts against its payouts and deposits on hand. Regan testified that moneys used to reduce the plug number would not appear in the on-line records kept by Heritage. That testimony explains why the transactions in Caliri's off-line account were not recorded in the Heritage bank record books or on the Heritage computers. In addition to the corroborating reductions in the plug number, other hearing evidence supported the validity of the handwritten entries made in Caliri's passbook. As examples, on March 7, 1983, a $50,000 check was deposited into Heritage's general account at Fleet Bank. A tape created by and taken from a Heritage adding machine shows a $50,000 deposit as having been made on March 7, 1983. With regard to the passbook record of a $35,042.81 deposit into Caliri's off-line account on April 5, 1989, a Heritage withdrawal slip indicates that amount as having been withdrawn from an on-line account that Caliri maintained at Heritage, and an amount equal to that figure is then shown in Caliri's passbook as having been deposited into his off-line account. In regard to the last deposit shown as having been deposited into Caliri's off-line account on April 23, 1990, there is a canceled check that had been drawn on Greater Providence Deposit Corporation by Caliri on April 23, 1990, in the amount of $39,515.43. The back side of that check indicates that it was processed through Heritage on the same day and was deposited into Heritage's general account at Fleet Bank in Providence on April 24, 1990.

Mollicone, the former president of Heritage, although called by the receiver, testified in essence, in support of Caliri's claim. His testimony supported in essential part the testimony given by Courtney Regan and by Caliri. Although Mollicone's credibility was questioned by the Superior Court justice who erroneously concluded that the master had rejected Mollicone's entire testimony on credibility grounds, that error is of no material consequence because more than sufficient other documentary and testimonial evidence existed in the record to support the decisions of the master and the trial justice, without our taking into account any portions of Mollicone's testimony before the master.

Accordingly, we conclude that the receiver's position is without merit. We perceive nothing in the plain and ordinary definition of "deposit" or in the § 42–116–3(h) definition of "deposit liabilities" that establishes any requirement that money placed in a bank be managed according to the usual business practices of the bank before it can be considered a valid deposit liability entitling its account holder to payment by the receiver. To read such requirements into § 42–116–3(h) and, consequently, § 42–116–12, is contrary to the plain language of the statute and the plain meaning of "deposit," and we decline to so limit the statutory language. Caliri placed his money into Heritage, as is required for a valid deposit pursuant to § 42–116–12. Thus Caliri's off-line account was a deposit liability, as that term is defined in § 42–116–3(h), and Caliri is entitled to payment in the amount of $179,116.67, pursuant to § 42–116–12.

■ In addition to the above claim of error, the receiver argues that the Superior Court's review of the master's decision was improper because it was based solely on the record developed at the hearing before the master and without conducting a separate de

novo hearing. We disagree. Superior Court Administrative Order No. 94–12 states that

> "[t]he Superior Court justice shall make a de novo determination of those portions to which the appeal is directed and may accept, reject or modify, in whole or in part, the judgment, order or decree of the Master. The justice, however, need not formally conduct a new hearing and may consider the record developed before the Master, making his or her own determination based on that record whether there is competent evidence upon which the Master's judgment, order or decree rests. The justice may also receive further evidence, recall witnesses or recommit the matter to the master [*sic*] with instructions."

Accordingly the trial justice is entrusted with broad discretion in his or her review of the master's decision. The trial justice can accept or reject the evidence presented and contrary to the receiver's assertions "need *not* formally conduct a new hearing." (Emphasis added.) We conclude that the trial justice's de novo review of the master's decision, based solely upon the record, was proper.

For all the above reasons the receiver's appeal is denied and dismissed, and the judgment of the Superior Court is affirmed. The papers in this case are remanded to the Superior Court.

FLANDERS, J., did not participate.